IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| Bocchi Americas Associates, Inc. | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-04-02411 |
| | § | |
| Commerce Fresh Marketing Inc.; | § | |
| Diran A. Elsaifi | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM ORDER, FINDINGS OF FACT, AND CONCLUSIONS OF LAW

On November 16, 2004, the parties consented to proceed before a United States magistrate judge, for all further proceedings, including trial and entry of a final judgment, under 28 U.S.C. § 636 (c). (Docket Entry # 16). In this action, Plaintiff Bocchi Americas Associates, Inc. ("Plaintiff," "Bocchi") claims that Defendants Commerce Fresh Marketing, Inc. ("CFM") and Diran A. Elsaifi ("Elsaifi") (collectively "Defendants") have not paid for agricultural commodities they contracted to purchase. (Complaint, Docket Entry # 1).

**Background**

In its essence, this lawsuit is an action on a debt which CFM owes for the purchase of produce. Bocchi, a wholesale supplier of fresh fruit and vegetables, sold a number of perishable agricultural commodities to CFM and it now wants payment for those goods. Bocchi's transactions with CFM are evidenced by a series of invoices dating from December 10, 2002, through June 27, 2003. (Complaint at ¶ 9). (Plaintiff's Ex. A 1-19). With each delivery, Bocchi submitted an invoice which recited that the commodities were sold subject to a statutory trust until full payment was

1

made. (Id). There is no question that CFM failed to pay for many of those deliveries, and the parties have now stipulated that $123,000 is still owed. (Defendants' Post-Trial Findings of Fact and Conclusions of Law, and Post Trial Brief, Docket Entry #54, p. 2); (Plaintiff's Post-Trial Memorandum of Law, Docket Entry #51, p. 2).

From the exhibits, and trial testimony, it was established that the last purchase was invoiced on June 27, 2003, and when payment was not received, CFM's credit was extinguished. Both before and after that time, the parties have had many discussions about the outstanding debt. CFM has claimed throughout that, on the date of the last invoice, its corporate representative, Elsaifi, sent Bocchi a check for $2,000, which was accompanied by a letter requesting that Plaintiff accept weekly payments, in that amount, until the remaining balance was paid. (Defendant's Ex. #1). Although Bocchi insists that it never received such a letter from Elsaifi, it nevertheless accepted seven individual payments, of $2,000 each, which were applied to the unpaid invoices. (Tr. Vol II, pp. 74-75). On December 9, 2003, many months after CFM's default, Bocchi faxed a letter to CFM demanding that it satisfy the outstanding debt. (Defendant's Ex. #8). In that letter, Thomas J. Leonardi ("Leonardi"), Bocchi's corporate representative, directed Elsaifi to send weekly payments, beginning December 15, 2003, through January 12, 2004, to settle three overdue invoices. (Id.). The overdue amount was never paid, and Bocchi then filed this lawsuit, on June 23, 2004. (Docket Entry # 1).    Less than one month later, CFM proposed to make monthly payments of $2,000.00 until the end of 2004, and then to increase the amount of each payment to $5,000. (Defendant's Ex. #6). There is no evidence that Plaintiff expressly agreed to this particular proposal. Three days later, however, Leonardi faxed Elsaifi another letter, demanding that the balance be paid, in full, immediately. (Defendant's Ex. #5). In that letter, Leonardi stated the following:

2

> [a] set monthly payment has never been agreed nor your proposed $2000.00 monthly payout cannot be deemed acceptable. All files must be paid as invoiced to you as stated. Don, you have promised to pay complete invoices in full within a year's time and only limited file payments have been done.

(Id). Further, on November 10, 2004, almost five months after this lawsuit was filed, the parties entered into an agreement for CFM to pay all outstanding balances, with scheduled payments to begin that month, and to continue through July 2005. (Defendant's Ex. 6). Apparently, CFM made only two payments, of $5,000 each, and at the time of the trial had not yet satisfied its admitted obligation to Bocchi. (Plaintiff's Proposed Findings of Fact, p. 4).

Through this lawsuit, Bocchi hopes to recover under the Perishable Agricultural Commodities Act of 1930 ("PACA"), as amended, 7 U.S.C. § 499a, *et seq.*, on the theory that a trust has been created in its favor. (Complaint at ¶¶ 7-16). Bocchi asks the court to find that both Defendants are liable for a breach of that trust, and that Elsaifi is individually liable for breaching his duties as a fiduciary of the alleged PACA account. (*Id*. at ¶¶ 28-31). In response, Defendants argue that Bocchi is not entitled to trust protection under the PACA, because it waived any such rights by its agreement to extend the time for payment beyond what the statute provides. (Defendant's Answer, p. 3). Further, Defendants claim that Elsaifi should not be held personally liable, because once the PACA trust protection was waived, no basis remained for an individual claim or judgment against him. (*Id*. at ¶ 30). Having now had the opportunity to listen to the witnesses, and to weigh the credible testimony, the court agrees with Defendants.

**The Claim Under The PACA**

Bocchi's lawsuit arises, in part, from the statutory protection extended to produce wholesalers under 7 U.S.C. § 499a, *et seq.*, the Perishable Agricultural Commodities Act, 1930 ("PACA"). That statute was enacted "to regulate the sale of perishable commodities and 'promote

3

fair dealing' in the sale of fruits and vegetables." *Reaves Brokerage Co., Inc. v. Sunbelt Fruit & Vegetable Co., Inc*., 336 F.3d 410,413 (5th Cir. 2003). In relevant part, the statute provides that a dealer who receives goods or derives proceeds from a wholesaler's wares, is to hold those items in trust for the benefit of the unpaid seller. [1] 7 U.S.C. § 499e(c)(2) (2005). That particular provision, in fact, creates a "'floating' trust in favor of sellers on the perishable commodities sold and the products and proceeds derived from the commodities." *Reaves Brokerage*, 336 F.3d at 413. That trust is effective immediately upon the delivery of the goods. *Id*. Under the general statutory language, a dealer must be paid promptly for a produce shipment, and the implementing regulation is explicit that a merchant must tender payment within ten days. [2] Definitions, 7 C.F.R. § 46.2(aa) (2006). However, a seller can participate in the trust benefits only by faithful compliance with the statute and the regulations attendant to it. Those regulations mandate that "[t]he maximum time for the payment for a shipment to which a seller, supplier, or agent can agree and still qualify for coverage under the trust is 30 days after receipt and acceptance of the commodities . . . . " Statutory trust, 7 C.F.R. 46.46(e)(2) (2006). That is, if a seller agrees to extend, for more that thirty days, the time in which it is to be paid for a produce delivery, it may no longer assert any right to a PACA

---

[1] To qualify for trust protection, under the PACA, sellers may extend only short-term credit. *See Am. Banana*, 362 F.3d at 38 (citing H.R. Rep. No. 98-543, at 6-7 (1983), *reprinted in* 1984 U.S.C.C.A.N. 405, 410; Regulations Under the Perishable Agricultural Commodities Act; Addition of Provisions to Effect a Statutory Trust, 49 Fed. Reg. 45735, 45738 (Nov. 20, 1984)); *Patterson Frozen Foods, Inc., v. Crown Foods, Int'l, Inc*., 307 F.3d 666, 669 (7th Cir. 2002) (citing *Greg Orchards & Produce, Inc. v. Roncone*, 180 F.3d 888, 891 (7th Cir. 1999).

[2] The statute authorizes the Secretary of Agriculture to draft and implement the regulations governing this legislation. Among the relevant regulations, is the one at 7 C.F.R. § 46.2 (aa), which states the following:

> Full payment promptly is the term used in the act in specifying the period of time for making payment without committing a violation of the act. 'Full payment promptly,' for the purpose of determining violations of the act, means:
>
> (1) Payment of net proceeds for produce received on consignment or the pro-rata share of the net profits for produce received on joint account, within 10 days after the date of final sale with respect to each shipment, or within 20 days from the date the goods are accepted at destination, whichever comes first.

7 C.F.R. § 46.2 (aa).

4

trust.

In this suit, Bocchi purports to enforce its rights under the PACA for the amounts owing on the unpaid CFM invoices. Defendants contend, however, that Plaintiff has waived its right to any trust benefits because it agreed, in a number of different ways, and on a number of different occasions, to extend the time allotted to CFM to pay for the produce. Bocchi challenges this defense on three fronts. First, it claims that the express regulatory language requires that any agreement to alter the payment terms must be negotiated before the goods are sold.[3] (Plaintiff's Post Trial Memorandum of Law, p. 7). As there was no pre-sale agreement here, Bocchi contends that Defendants' remaining arguments are moot. Second, Bocchi argues that, if, in fact, a "post-default" agreement is authorized under the statute, that agreement must be in writing, and no oral agreement will suffice to waive trust protection. Bocchi is adamant that there was no written agreement in this case, either before or after the deliveries, that would render trust protection unavailable. Finally, Bocchi argues that, even assuming that oral agreements can result in a waiver of trust protection, any purported agreement must comply with the statute of frauds, and as no such agreement here does so, CFM's defense cannot succeed. (Plaintiff's Post Trial Memorandum of Law, p. 8).

Unfortunately, the Fifth Circuit has not yet addressed these trust forfeiture issues in any opinion discussing the PACA. In fact, the court was unable to locate any decisions from this circuit

---

[3] That regulation is detailed in 7 C.F.R. § 46.46 (c)(2), which is set out below:

> Provided, [t]hat a principal may elect to waive its right to trust protection. To be effective, the waiver must be in writing and separate and distinct from any agency contract, must be signed by the principal prior to the time affected transactions occur, must clearly state the principal's intent to waive its right to become a trust beneficiary on a given transaction, or a series of transactions, ans must include the date the agent's authority to act on the principal's behalf expires.

7 C.F.R. § 46.46 (c)(2).

which made findings on the arguments raised by these parties.[4]  From a review of all published decisions to date, however, it is clear that courts in the Second, Sixth, Seventh and Eighth Circuits have done so.  For varying reasons, each of the appellate courts in those circuits have recognized that a "post-default" forfeiture can result from a wholesaler's agreement to extend the payment terms beyond the regulatory deadlines.  *See Am. Banana Co. v. Republic Nat'l. Bank of N.Y., N.A.*, 362 F.3d 33 (2nd Cir. 2004), (oral agreement); *Patterson Frozen Foods, Inc. v. Crown Foods, Int'l, Inc.*, 307 F.3d 666 (7th Cir. 2002), (written agreement); *In re Lombardo Fruit & Produce Co.*, 12 F.3d 806, 809 (8th Cir. 1993), (written agreement); *Overton Distribs., Inc. v. Heritage Bank*, 340 F.3d 361 (6th Cir. 2003), (written agreement).  Moreover, two highly informative, and apparently influential, opinions have been issued on the very points raised here, by both the Seventh and the Second Circuit Courts of Appeals.  *Am. Banana*, 362 F.3d at 33; *Patterson*, 307 F.3d at 666.  And while, the Fifth Circuit has not been required to decide these issues, it did note, in *Reaves Brokerage Co., Inc. v. Sunbelt Fruit & Vegetable Co., Inc*., 366 F.3d 410 (5th Cir. 2003), that it was relying on the Second Circuit's analysis of the history and purpose of the PACA in deciding the novel issue presented in that case.  366 F.3d at 414.

Although Plaintiff argues to the contrary, the court is persuaded by the reasoning in those decisions that a "post default" agreement to extend the payment period is inconsistent with the prompt payment objective which spawned the PACA legislative protection.  For that reason, the court concludes further that such agreements, can, in fact, result in a waiver of the trust benefits.  As the Seventh Circuit observed, "PACA and PACA trust rights are designed to protect small produce sellers who operate in a cash market and depend upon prompt payment to survive." *Patterson*, 307 F.3d at 671; *see also Am. Banana*, 362 F.3d 33, 44 (2nd Cir. 2004); *In re Lombardo*,

---

[4] There is, however, one bankruptcy decision from the Northern District of Texas, in which, following a lengthy discussion of the parties' contentions on these very points, the court makes clear that it is not deciding whether PACA protection can be waived by a post default agreement.  Instead, the case was resolved on other grounds entirely.  *See In re Cafeteria Operators, L.P.*, 299 B.R. 411 (Bankr. N.D. Tex. 2003).

12 F.3d 806, 809 (8th Cir. 1993). The court also finds persuasive the Second Circuit's reasoning in *American Banana,* which held that oral, as well as written post default agreements, can result in a waiver of the trust protection.

> Rather, we conclude that a failure to reduce to writing an agreement that violates PACA, should not result in the preservation of the trust, where the same agreement, if memorialized, would have resulted in forfeiture of such protection. To hold otherwise would yield the unacceptable result of preserving trust protection for a seller who reaches an agreement containing a payment period exceeding thirty days and performs thereunder so long as the seller does not reduce the agreement to writing. Accordingly, we hold that where, as here, a seller agrees-orally or in writing-to a payment period exceeding thirty days, it forfeits trust protection.

*Am. Banana*, 362 F 3d at 46-47. At issue then is whether Bocchi's conduct, in this instance, amounts to a forfeiture of the PACA trust protection.

**The Trial Testimony**

This is a story that has no winners. Neither, however, does it have any villains. Try as it might, Plaintiff has not succeeded in painting Elsaifi as a cunning businessman out to exploit a vulnerable supplier. Although he was undoubtedly out-maneuvered years ago by another entity, in sour business dealings of his own, the court is not convinced from the evidence that Elsaifi used that experience in an attempt to evade his obligations to Bocchi. Given the opportunity to listen to the witnesses and to appreciate their demeanor, the court is persuaded, from the weight of the credible evidence, that Bocchi forfeited its rights to a PACA trust in a number of ways.

The parties are in complete agreement that a supplier's protection under a PACA trust stems from the statutory requirement that payment for produce is to be final within 10 days of the sale. 7 C.F.R. § 46.2 (aa). Bocchi's own invoicing procedures, however, bespeak a decidedly casual attitude towards enforcing that right. On the invoice form which it sends to all purchasers, and the very form sent to CFM, Bocchi sets "Pay Terms: net 21." (Plaintiff's Exhibit A, Trial Transcript, Volume 1, pp 101-102). ("Tr. Vol. I"). And, even though Bocchi's accounts receivable manager, Donna Undercuffler, insisted that extensive training and attention is devoted to ensuring that no

7

waiver of trust rights occurs, Plaintiff's actions belie that professed policy. (Tr. Vol. 1, p. 92). From the evidence presented, it is beyond question that Bocchi regularly accepted less than the total amount due from CFM, and that those payments were made well beyond the statutory ten day limit, or even Bocchi's own "net 21" day requirement. (Tr. Vol. 1, p. 93). So, despite Mrs. Undercuffler's contention that Bocchi never received the June 27, 2003, letter from Elsaifi, in which he proposed to pay the debt in increments, the fact is that the company regularly accepted such piecemeal payments. While the invoice form alone may not constitute a waiver of trust rights, it does show that the company's conduct was often at odds with the strict adherence to the statute to which Mrs. Undercuffler testified.

A second example of Bocchi's disregard of its own procedures is the continued extension of credit to CFM even though it had exceeded its credit line, and regularly failed to make total, or even partial, payment for the goods received. Bocchi's president, Tom Leonardi, testified that when a company "hit the credit limit," no more produce was sold until the outstanding debt was fully satisfied. (Tr. Vol. 1, p. 122). Leonardi testified further that, if a customer reached his predetermined credit limit, he was placed on a "stop list" so that no more supplies were sent until the invoices were paid. (Id.). But Leonardi also testified that CFM's credit limit was "about $125,000.00," and yet it was still supplied with produce when its outstanding balance exceeded that amount. (Id.). In fact, the balance due to Bocchi was more than $170,000.00, in June 2003, when Plaintiff finally extinguished all credit to CFM. (Tr. Vol II, p. 40). Leonardi acknowledged that, at the time, and counter to the company policy, CFM was approximately "33% over its credit limit." (Tr. Vol II, p. 51; Ex. 7). At trial, Leonardi conceded that, from December 10, 2002, through June 27, 2003, Bocchi continued to sell produce to CFM even though it was not making timely payments, much less paying invoices within the ten days specified under the PACA. (Tr. Vol. I, p. 123). Indeed, even after CFM was placed on the stop list, and after its credit had been extinguished,

8

Leonardi still directed some limited produce shipments to Elsaifi's company in early 2004. (Tr. Vol II, pp. 29-32). The testimony was likewise clear that, from December 10, 2002, through December 8, 2003, CFM had made no payments on its debt, other than the $2,000.00 check dated June 27, 2003. (Tr. Vol. II, p. 48). In fact, Bocchi let seven months elapse before any payments, at all, were made on an invoice which dated from December 2002. (*Id*.).

Leonardi's testimony was similarly clear that, taking action against CFM, under the PACA, presented the risk that Elsaifi would file for bankruptcy, eliminating all possibility of priority payments to Bocchi. The court is convinced, from the circumstances, as well as from Leonardi's testimony, that, as he stated, it was "not . . . beneficial to Bocchi Americas if I . . . jump in there, and send the feds in there, and start a lawsuit. Then everything gets shut down and then we don't get nothing." (Tr. Vol. II, p. 24). Even after Bocchi became aware of CFM's acute financial problems, including an injunction that had been entered against it by another seller, Chiquita Brands, Leonardi testified that "the best alternative - the only alternative I had with Don was to sit there and tell him to get payments out to us on the invoices that was notified on December 9th is a classic communication where he's got his Chiquita injunction. And this is what he communicated to me that here's what we'll do." (Tr. Vol. II, pp. 62-63).

Leonardi also acknowledged that, even after he learned that Chiquita Brands had filed a PACA action against CFM, Bocchi was still accepting partial payments of about $2,000.00 each. (Tr. Vol. II, p. 66). Rather than taking similar action under the statute, with the predictable results, Leonardi "gave them ample time to address the situation." (Tr. Vol. II, p. 24) (Defendants' Ex. #8.). The court is persuaded that the "ample time" Leonardi testified to is reflected in the faxes that he sent to Elsaifi in December 2003, and in July 2004. (Defendants' Exs. #5, 8). Despite this evidence, Leonardi tried to dispel the notion that he had agreed to extend the payment terms. He did concede, however, under his own attorney's questioning, that to an "outside observer" it would not be "an

9

unreasonable interpretation" that Bocchi had, in fact, agreed to extend the time for payment to allow CFM to become current on its debt. (Tr. Vol. II, p. 25).

In addition, as Defendant pointed out, the lawsuit against CFM was initiated approximately one year after the last invoice was sent. (Tr. Vol. II, p. 107). Had Elsaifi continued to make the $2,000.00 payments on the balance then outstanding, his debt to Bocchi would have been satisfied.[5] (Tr. Vol. II, p. 108). From the evidence as a whole, the court is persuaded that the fact that the payments did not continue, and that the debt was not extinguished within a year, does not negate Bocchi's willingness, and its agreement, to allow the produce payments to continue well beyond the statutory limit of thirty days. That extension of terms, beyond thirty days, "disqualifies a seller as a trust beneficiary." *Idahoan Fresh v. Advantage Produce, Inc.*,157 F.3d 197, 206 n.9 (3rd Cir. 1998) (discussing *In re Lombardo*, 12 F.3d at 807).

Finally, the court is persuaded, from the credible testimony, that Tom Leonardi was sympathetic to Elsaifi's financial troubles and did, in fact, allow him an opportunity to pay the arrearage in installments. Allowing him that opportunity necessarily extended the payment deadline to well beyond the ten days set in § 46.2 (aa), the 21 days required by Bocchi's invoices, or even the thirty days outlined by the statute as the extreme limit to "prompt payments." In fact, the court is convinced that, as Mrs. Undercuffler observed, ". . . Mr. Leonardi would give anybody a chance. I know him to be that kind of man." (Tr. Vol. I, p. 112). The court finds further that this agreement to extend the payment terms is reflected in Leonardi's fax, sent on July 16, 2004, in which he acknowledges Elsaifi's earlier promise to pay off the outstanding balance within one year.[6]

---

[5] Elsaifi and Bocchi had continued disagreements about the exact amount owed on each invoice. These disputes generally centered on credits allegedly owed to CFM for damaged or otherwise over valued produce. At the time that Elsaifi proposed paying on the CFM debt, Elsaifi's calculation of the amount owed differed from Plaintiff's claim. Assuming CFM's debt calculation to be roughly accurate, Elsaifi's proposal would have extinguished the debt before June 2004. (Tr. Vol. I, pp. 52-56).

[6] "Don, you have promised to pay complete invoices in full within a year's time and only limited file payments have been done." (Defendant's Ex. #5).

(Defendants' Ex. #5). Despite Plaintiff's repeated insistence that there was no oral agreement, which would satisfy the Texas statute of frauds, the court disagrees.

On that last point, the parties were invited to raise appropriate choice of law considerations which affect the oral contract alleged by CFM as a defense to Bocchi's claim. Plaintiff did so in a letter brief in which it acknowledged that whether Texas law or Pennsylvania law is applied on this issue, the outcome is the same.[7] (Letter to the court, filed March 1, 2006, p. 1). As a preliminary matter, it bears noting that the statute of frauds is intended to "prevent fraud and perjury in certain kinds of transactions." *Haase v. Glazner*, 62 S.W.3d 795, 799 (Tex. 2001). It provides that some promises are unenforceable unless they are in writing and signed by the person to be held accountable. TEX. BUS. & COM. CODE ANN. § 26.01 (a) (2006). The statute only applies, however, to agreements that are "not to be performed within one year from the date of the making of the agreement." Id. at § 26.01 (a)(6). If an agreement, either by its terms or by the nature of the required performance, cannot be completed within one year, it falls within the statute and it must be in writing to be enforceable. *Schroeder v. Tex. Iron Works, Inc.*, 813 S.W.2d 486, 489 (Tex.1991). *Niday v. Niday*, 643 S.W.2d 919, 920 (Tex. 1982).

But, because the statute of frauds applies only to those agreements which cannot be performed within one year, those that "can conceivably be performed within one year — that is, if it is remotely possible" are not governed by that rule. 49 David R. Dow & Craig Smyser, Tex. Prac. Series, *Contract Law*, § 4.5 (2006). If the terms cannot conceivably be performed within one year, then a writing is required. *Id*. In addition, the parties' intentions are generally not relevant, and it is an objective standard only which determines whether the contract can be completed within that time. Moreover, if an agreement does not specify a definite time for performance, courts are

---

[7] . . . both states essentially follow the Restatement 2d with regard to statute of frauds cases and issues, although Pennsylvania tends to apply it in more of a procedural context. Both States appear to defer to applicable statutory limits or changes. Thus we have found no meaningful conflict between Texas and Pennsylvania law which may be applied in this case. (Plaintiff's letter brief, filed March 1, 2006, p. 1).

11

allowed to infer that it is intended to be satisfied in a reasonable time, based on all of the circumstances, the relationship between the parties, and the subject matter of the contract. *Id*. at n.15. If, after considering all of those factors, the court is satisfied that the agreement could reasonably be completed within a year, such an agreement falls outside the purview of the statute of frauds. *Id*. at n.17. Finally, it has been noted that in cases with particularly close or marginal facts, Texas courts "tends to regard an agreement that provides no known completion date as one that is performable within one year." *Id.* at § 4.5; *see also Bratcher v. Dozier*, 346 S.W.2d 795 (Tex. 1961).

Even if the statute of frauds does not apply, however, the elements of written and oral contracts are the same, and they must be present for the parties to be bound. *Bank of El Paso v. T.O. Stanley Boot Co.*, *Inc.* 809 S.W.2d 279, 284 (Tex. App. - El Paso 1991), *aff'd in part, rev'd in part on other grounds*, 847 S.W.2d 218 (Tex. 1992). Generally a valid contract requires proof of "(1) an offer, (2) an acceptance, (3) a meeting of the minds, (4) each party's consent to the terms, and (5) execution and delivery of the contract with the intent that is be mutual and binding." *Prime Prods., Inc. v. S.S.I. Plastics, Inc.*, 97 S.W.3d 631, 636 (Tex.App.- Houston [1 Dist.] 2002, pet. denied); *Angelou v. Afr. Overseas Union*, 33 S.W.3d 269, 278 (Tex. App.-Houston [14th Dist.] 2000, no pet.). To determine whether an oral contract exists, the communications between the parties, and the conduct and circumstances surrounding those communications, must be examined. *Prime Prods*., 97 S.W.3d at 636; *Copeland v. Alsobrook*, 3 S.W.3d 598, 605 (Tex. App. - San Antonio 1999, pet. denied). Further, if an oral contract does not contain the performance terms, its duration may be implied from extrinsic evidence. *Niday v. Niday*, 643 S.W.2d 919, 920 (Tex. 1982).

Curiously, although Plaintiff has consistently denied any agreement to extend the payment terms, thereby forfeiting its PACA trust protection, it has never attempted to refute the particular elements of a contract in any other way. Instead, it insists repeatedly that no oral contract is

12

enforceable here because there was no writing which satisfied the statute of frauds. But the agreement Defendants' point to here is not governed by the statute of frauds, as it was intended to be completed within one year, and so Plaintiff's argument on that point is without merit. From the circumstances presented, the court is persuaded, from a preponderance of the credible evidence, that Leonardi did agree to allow Elsaifi to pay off his debt within one year. This conclusion is bolstered not only by Leonardi's own written statement to Elsaifi in which he reminds Elsaifi of his "promise to pay within a year, " but also by the fact that the proposal to pay $2,000.00 a week, would have, in fact, extinguished CFM's debt within a year of June 2003. That agreement is outside the statutory requirement of a written agreement. (Defendants' Ex. #5). The fact that Elsaifi was unable, or unwilling, to fulfill the promise to pay his debt in one year's time does not refute Leonardi's agreement to allow him to do so. Because Leonardi agreed to allow CFM to pay off its debts, rather than insisting on Bocchi's right to immediate payment under the PACA, that agreement constitutes a waiver of the statutory trust protection. In sum, as Defendants suggest, Leonardi "made a business decision to wait" for CFM to satisfy its debt. (Tr. Vol. I, p. 67). But while Leonardi's admirable personal trait reflects well on him as a friend and employer, unfortunately, it undermines the company's repeated assertions that it was diligent in protecting its rights under the PACA.

In the alternative, there is no question that, while this lawsuit was pending, the parties reached an agreement, in writing, signed by both, to extend the time for Elsaifi to make good on his debt to Bocchi. (Defendants' Ex. #8). While this agreement might, arguably, be considered akin to settlement discussions and inadmissable for that reason, in the context of this particular complaint, the court is convinced that it is worthy of consideration. This is so for a number of reasons. First, Bocchi has argued throughout that there could have been no waiver of its trust rights because there was never any agreement, in writing, to allow for extended payment terms. But even after taking that stance, and after filing suit, Bocchi nevertheless entered into an agreement at odds with that very

13

pronouncement. It is understandable that Bocchi would protest the court's consideration of this agreement, as it was struck while the case was pending, and it was never fulfilled. It argues that, for those reasons, it should be considered an abandoned settlement negotiation. (Plaintiff's Proposed Findings of Fact, p. 4). While that is an appealing argument, it cannot be denied that the document definitely points to Bocchi's willingness to agree to an extension of payment terms. That willingness is completely contrary to its earlier contentions and to the statutory scheme by which Bocchi hopes to recover. In *Patterson*, the post complaint agreement, which the court cited in finding that the trust rights had been forfeited, is similar to the post suit agreement here. The court in *Patterson* concluded that "PACA rights are lost whenever the parties enter into a written agreement that satisfies the generally applicable statute of frauds." *Id*. at 67. It is reasonable to conclude, as did the *Patterson* court, that regardless of when an agreement is made, and regardless of whether the purchaser makes one or all of the payments required by that agreement, the benefits of the PACA trust are lost by virtue of the agreement itself.

In the present case, the court agrees with Defendants that, even though the parties' written agreement of November 8, 2004, was entered into after Bocchi filed this lawsuit, the timing is not dispositive to the waiver issue. Any post-default agreement, including one that is made after an action to recover damages has been filed, destroys the PACA trust. Here, if Bocchi had not already forfeited its trust rights under PACA by its conduct and agreements prior to this lawsuit, those PACA trust rights were lost when it drafted and executed the November 8, 2004 agreement.

On this record, there is no justification for the court to extend to Bocchi more protection than its own representatives chose to accept. For all of the reasons outlined in this memorandum, the court concludes that Plaintiff waived its rights under the statutory trust, and its pursuit of CFM for the amounts outstanding is subject to no greater protection than that of any other creditor. From the testimony and exhibits, the court finds for Plaintiff Bocchi Americas, Inc., against Defendant

14

Commerce Fresh Marketing, Inc., in the amount of $123,000.00, plus pre-judgment, as well as post-judgment interest. The court finds further that no PACA trust is in place, and that Defendant Diran A. Eslaifi was not subject to the agreements by which the debt was incurred. For that reason, the court finds in his favor on the debt.

### Attorney's Fees

As detailed above, Plaintiff prevails in its breach of contract claim against Defendant CFM, and it is entitled to recover $123,000.00, plus interest on that claim. On its request for attorney's fees, the court finds that Bocchi is entitled to recover, under section 38.001(8) of the Texas Civil Practice and Remedies Code, the sum of $38,400.00, for fees to date, and $7,500.00 in the event of an appeal.

At the outset, Defendants correctly challenge the law under which Plaintiff may receive any award of attorney's fees. While, in the original complaint, Plaintiff requested fees only under Texas law, on its breach of contract claim, in its post-trial briefing, Bocchi made clear that it is also seeking attorney's fees under 7 U.S.C. § 499(e)(c), the PACA. (Complaint at 8; Plaintiff's Supplemental Post-Trial Brief at 6, 12-13). Defendants argue, however, that there is no basis for a fee award under that statute, and on this point, the court agrees. And not only because Plaintiff did not prevail on that claim. The Fifth Circuit has recognized that the "PACA does not provide for attorney's fees," even though "some courts have held that recognition of the PACA trust established a common fund from which attorney's fees may be recoverable." *Golman-Hayden Co. v. Fresh Source Produce Inc.*, 217 F.3d 348, 352 (5th Cir. 2000) (citations omitted). While declining to answer whether it adopted such a "common fund exception," the court found that the plaintiffs before it were not entitled to fees, even if that exception applied in this circuit. *See id.* at 352-53. In *Golman-Hayden Co.*, the court reasoned that the plaintiffs had not included in their pleading "a prayer for relief requesting the preservation or creation of such a trust," nor had they shown that they "intended to create a common

fund. Plaintiff's complaint contains no prayer for the creation or preservation of a common fund. Nor has this Plaintiff made any showing that it intended to create such a fund. For that reason, assuming that attorney's fees are available under such a "common fund exception," Bocchi would not be entitled to them in this case, even if it had succeeded on that claim. *See id.* Further, as Plaintiff's claim against Elsaifi, individually, was also rejected, the only attorney's fees available to Bocchi arise from its state law contract claim, and are recoverable from CFM only.

In this circuit, a fee award "is governed by the same law that serves as the rule of decision for the substantive issues in the case." *Mathis v. Exxon Corp.*, 302 F.3d 448, 461 (5th Cir. 2002) (citing *Kona Tech. Corp. v. Southern Pac. Transp. Co.*, 225 F.3d 595, 614 (5th Cir. 2000)). "State law controls both the award of and the reasonableness of fees awarded where state law supplies the rule of decision." *Id.*; *accord DP Solutions, Inc. v. Rollins, Inc.*, 353 F.3d 421, 433 (5th Cir. 2003). In Texas, attorney's fees can be awarded only if there is a statutory basis to do so, or if the parties have otherwise agreed. *See Holland v. Wal-Mart Stores, Inc.*, 1 S.W.3d 91, 95 (Tex. 1999); *Travelers Indem. Co. of Conn. v. Mayfield*, 923 S.W.2d 590, 593 (Tex. 1996). "The authorization of attorney's fees in civil cases may not be inferred; rather it 'must be provided for by the express terms of the statute in question.'" *Id.* (quoting *First City Bank—Farmers Branch v. Guex*, 677 S.W.2d 25, 30 (Tex. 1984)); *see Holland*, 1 S.W.3d at 95.

The Texas Civil Practice and Remedies Code states, in relevant part, that a party may "recover reasonable attorney's fees from an individual or corporation, in addition to the amount of a valid claim and costs, if the claim is for . . . (8) an oral or written contract." TEX. CIV. PRAC. & REM. CODE ANN. § 38.001. Clearly, then, Texas law authorizes an award of fees to Bocchi on its breach of contract claim. *See Fluorine On Call, Ltd. v. Fluorogas Ltd.*, 380 F.3d 849, 866 (5th Cir. 2004); *American Home Assurance Co. v. United Space Alliance, LLC*, 378 F.3d 482, 492 (5th Cir. 2004); *Green Int'l Co. v. Solis*, 951 S.W.2d 384, 390 (Tex. 1997). To determine a "reasonable" award, "[t]he Texas Supreme Court has outlined eight relevant factors for courts to consider."

2001). These factors are listed below:

> (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill required to perform the legal service properly;
> (2) the likelihood . . . that the acceptance of the particular employment will preclude other employment by the lawyer;
> (3) the fee customarily charged in the locality for similar legal services;
> (4) the amount involved and the results obtained;
> (5) the time limitations imposed by the client or by the circumstances;
> (6) the nature and length of the professional relationship with the client;
> (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and
> (8) whether the fee is fixed or contingent on results obtained or uncertainty of collection before the legal services have been rendered.

*Fluorine On Call, Ltd.*, 380 F.3d at 867 (citing *Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 818 (Tex.1997)); *American Home Assurance Co.*, 378 F.3d at 491 & n.9; *Kona Tech. Corp.*, 225 F.3d at 614 n.7; *see also Vela*, 276 F.3d at 679-80 & n.24 (recognizing that these are comparable to the so-called "*Johnson* factors," detailed by the Fifth Circuit in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974)). "The Texas Civil Practice and Remedies Code provides a rebuttable presumption that usual and customary fees are reasonable." *Fluorine On Call, Ltd.*, 380 F.3d at 866 (citing TEX. CIV. PRAC. & REM. CODE § 38.003). It is obvious, under either scheme, that the court retains discretion in determining the amount of fees to be awarded. *See Fluorine On Call, Ltd.*, 380 F.3d at 866 (citing *Mathis*, 302 F.3d at 462).

Because Bocchi, as the prevailing party on the breach of contract claim, is entitled to attorney's fees from CFM, the next question is the reasonableness of any sum awarded. *See Fluorine On Call, Ltd.*, 380 F.3d at 866; *Solis*, 951 S.W.2d at 390. At trial, Plaintiff's counsel, Craig Stokes ("Mr. Stokes"), testified that he and his co-counsel, Mark Mandell ("Mr. Mandell"), charge hourly fees of $325.00 and $250.00, respectively. (Tr. Vol II, p. 92; *see* Plaintiff's Exhibit E). Defendants' attorney, Dennis McQueen ("Mr. McQueen"), did not object to those hourly rates, nor did he object to Plaintiff's request for $7,500.00 in fees if the case is appealed. (Tr. Vol II, p. 94, 129-130). The court, then, accepts these figures as indisputably reasonable. Defendant does, however, argue that the total amount of fees requested by Plaintiff is not reasonable. (Defendants'

17

Post-Trial Brief at 15-16). It is necessary, then, for the court to explore the impact of the relevant factors on that requested sum.

Under Texas law, the first factor to be considered in determining a reasonable fee is "the time and labor required, the novelty and difficulty of the questions involved, and the skill required to perform the legal service properly." *Fluorine On Call, Ltd.*, 380 F.3d at 867 (citing *Arthur Andersen & Co.*, 945 S.W.2d at 818). Mr. Stokes testified that this case required 240 hours of attorney time to investigate and prosecute Bocchi's claim. (Tr. Vol II, p. 96-104). This sum represents 47 hours that he billed, and 193 hours billed by Mr. Mandell. (Tr. Vol II, p. 96-104; *see* Plaintiff's Exhibit E). In all, Plaintiff seeks an award of approximately $65,000. (*Id.*).

In support of this request, Mr. Stokes testified that he and Mr. Mandell are two of the only 20 attorneys in the nation who regularly handle cases involving the PACA, and claims under that legislation. (Tr. Vol II, p. 93, 101). He also testified that this case was unusual in that PACA cases typically do not require extensive discovery, depositions, dispositive motions, or trial, as were required here. (Tr. Vol II, p. 94). Mr. Mandell also contends that their lack of familiarity with local rules and procedures put them at a disadvantage in relation to Mr. McQueen, who works regularly in this forum. (Tr. Vol II, p. 130). For his part, Mr. McQueen testified that this is the fifth PACA case he has handled, and he agreed that expertise in this area justifies a higher hourly rate. (Tr. Vol II, p. 128-29). He pointed out, however, that he billed no more than 100 hours to defend Bocchi's claim, even though he lacked the experience or expertise of Mr. Stokes and Mr. Mandell. (*Id.*). The court is persuaded from Mr. McQueen's representations, as well as from the totality of the circumstances, that 240 hours of attorney time is an excessive amount of time to devote to a case with three witnesses and limited documentary evidence. Moreover, in light of Mr. McQueen's assertion that only 100 professional hours were devoted to defending the case, the request appears even more unrelated to the actual proceeding.

Neither party presented evidence on the second factor, "the likelihood . . . that the acceptance of the particular employment will preclude other employment by the lawyer," and this has little

18

relevance to an award in this instance beyond the court's awareness of the travel time both Plaintiff's attorneys were required to spend. *See Fluorine On Call, Ltd.*, 380 F.3d at 867. The third factor, which addresses customary fees for this type of dispute, is not contested, at all. The next factor, however, "the amount involved and the results obtained," is most significant here. *Id.* The parties stipulated that $123,000.00 was at stake under the contract, and the court has awarded that amount to Plaintiff in actual damages. (Defendants' Post-Trial Brief at 2; Plaintiff's Post-Trial Brief at 2). The request for $65,000.00 in attorney's fees, more than half of the amount recovered on the only viable claim, the court finds to be unreasonable. This is especially so in light of the disparity between the hours billed by the parties' counsel in this matter.

The fifth, sixth, and eighth factors, regarding "time limitations," "the nature and length of the professional relationship with the client," and "whether the fee is fixed or contingent," do not appear to hold any importance here. *See Fluorine On Call, Ltd.*, 380 F.3d at 867. The seventh factor, which involves "the experience, reputation, and ability of the lawyer or lawyers performing the services," is certainly relevant. *See id.* During trial and in its briefing, Bocchi's attorneys made much of their expertise in PACA law, but argued that they were somehow handicapped by a lack of familiarity with local procedures. In that regard, the court questions Mr. Stokes's testimony on the necessity to have two of the reported "20 elite PACA lawyers" involved in this one case in which less than $125,000.00 was in contention. Further, any PACA action, or any other federal question case for that matter, is tried under the Federal Rules of Civil Procedure, so that any minor differences in local procedures could have been easily addressed through a telephone call to the case manager, if not a reference to the local court rules themselves.

Having considered the record, in view of the relevant factors set out by the Texas Supreme Court, the court finds that prosecution of this case reasonably required no more than 125 hours of Mr. Mandell's time, and the court will award fees for the 22 hours of trial time that Mr. Stokes testified that he devoted to Bocchi's claims. At their regular rates, this corresponds to an award of $31,250.00 for Mr. Mandell's time, and $7,150.00 for Mr. Stokes's time, for a total award of

$38,400.00.  In addition, Plaintiff is entitled to $7,500.00 if an appeal is pursued.

Finally, Plaintiff is entitled to both pre-judgment and post-judgment interest on the actual award to Bocchi.  *See Hall v. White, Getgey, Meyer Co.*, ___ F.3d ___, 2006 WL 2686950, at *6 (5th Cir. Sept. 20, 2006); *International Turbine Servs., Inc. v. VASP Brazilian Airlines*, 278 F.3d 494, 499-500 (5th Cir. 2002).  Unless otherwise agreed by the parties, under Texas law, the pre-judgment interest rate in a breach of contract action is governed by the Texas Finance Code.  *See Hall*, 2006 WL 2686950, at *6; *International Turbine Servs., Inc.*, 278 F.3d at 499-500.  In this case, the pre-judgment interest rate is 5% per annum.  *See* TEX. FIN. CODE §§ 304.003(c)(2), 304.103; *Hall*, 2006 WL 2686950, at *6.  The post-judgment interest rate, which applies to judgments entered in federal court, is governed by federal law.  *See Hall*, 2006 WL 2686950, at *6 (citing 28 U.S.C. § 1961(a)).  Today, that post-judgment interest rate is 4.90% per annum.

**Conclusion**

Based on the foregoing, it is **ORDERED** that a judgment be entered on behalf of Bocchi Americas Associates, Inc., against Defendant Commerce Fresh Marketing, Inc., in the amount of $123,000.00, plus pre-judgment interest at the rate of 5%, and post judgment interest at the rate of 4.9%.  Bocchi is awarded attorney's fees in the amount of $38,400.00, and $7,500.00 in the event of an appeal.

Accordingly, it is ORDERED that this cause be DISMISSED with prejudice.

The Clerk shall enter this order and provide a true copy to all counsel of record.

SIGNED at Houston, Texas this 6th day of October, 2006.

MARY MILLOY
UNITED STATES MAGISTRATE JUDGE